which is 17,2195 inch in Mecca versus Panama. Good morning, your honors. May it please the court. The board erred and it misunderstood the technology in this case. When it ruled that a melting point depressant is the same thing as a solvent, it based this ruling on unsupported conclusory expert opinion of petitioner's expert, Dr. Gribble, particularly paragraph 95. Can I just start, before you start to get into this, can you put what you're saying in context so that I can understand the significance? Yes. Is the significance that GARDA was limited to DCM, DCA interchangeability only with respect to the melting plot? Is that the point you're The underpinning of the board's obvious misholding was its conclusion that GARDA taught that DCA and DCM are equivalent interchangeable reaction solvents and therefore it was obvious to substitute DCA for DCM as the reaction solvent in the EP117 primary reference. Is the red brief correct that DCA can be employed as a substitute for DCM without TCA? No, your honor. Not in GARDA. GARDA makes very clear that his solvent is TCA and that the only reason for adding DCA to TCA is to depress the melting point of the TCA, which is because that's where he conducted his reaction. GARDA, if anything, tells the reader that if you don't have TCA, which is his solvent, there is no reason to have DCA. DCA is only there to depress the melting point. As I started out, and I apologize your honor for jumping into the middle of this issue, but this really is a central issue to the obvious. I understand the issue. The question I have is that didn't the board also rely heavily not just on the teachings of GARDA, but on the testimony that it credited by Dr. Gribble. The board credited his testimony over your witness's testimony. They seem to cite his declaration and his testimony, in addition to GARDA, for the proposition that you're saying they erred. Dr. Gribble's testimony was primarily that GARDA's disclosure of DCA and DCM as melting point depressants was the same thing as saying they are reaction solvents. That's where we think there was absolutely no support for the citation, for example, just picking one of them out of the board's decision of APPX11. We are persuaded that one skilled in the art would have understood that in GARDA, DCA is acting as both a solvent and what is referred to in GARDA as a melting pot depressant. They cite to the Gribble declaration and they go on to talk about the disagreement between your witness and their witness and why they're crediting their witness. The fact is there was actually no disagreement because our witness provided extensive testimony on what a melting point depressant is and why that's different from a reaction solvent. In fact, he testified that they were the exact opposites. I would refer you to Professor Curran's... The board says they have presented conflicting testimony on this point and they credit Dr. Gribble, right? I know your view is that this is wrong. I just want to know if I'm reading what the board said correctly. I think you've read what the board said correctly. My point, your honor, is first of all, I guess I would go back to what is substantial evidence? That's really what we're talking about here. Is your point that their expert is wrong? Their expert is wrong, but I also wish to make the point that there is no substantial evidence... I thought their expert agreed with your expert. Are they both wrong? I don't know what... You said there was no disagreement. I'm sorry? You said there was no disagreement between experts. No, no. If I said that, I misspoke, your honor. I'm sorry. The experts did disagree, but the point here, first of all... Let me ask you this, because the standard review on us overturning the board's reliance on their expert for being incorrect is almost impossible for you to make. Let's assume their expert is correct. That what he said is we're not going to challenge the veracity of that. Why isn't that substantial evidence for this point? Your honor, this court has held in Pharmastem versus Biasel and most recently in Erickson versus Intellectual Ventures that when an expert opinion is a conclusory opinion that is inconsistent with the record, inconsistent with the prior art, that will not be treated as substantial evidence. Well, that's not Judge Sweeney that we're going to accept that. What do you have left if we accept the expert's testimony, or at least we accept that the board has substantial evidence based on the expert's testimony to reach its conclusion? If I might just comment though, you did refer to the fact that they stated that they were giving more credibility to the expert who testified for was present in the Erickson versus Intellectual Ventures case. The court said in that case that the expert opinion was simply inconsistent with the prior art. Sure, but the premise of that conclusion is the court is not agreeing with the expert's testimony. They've met that very high burden. The premise, or at least the basis for my hypothetical was I don't agree with that. I'm accepting the expert's opinion as true. If that's the case, isn't that substantial evidence for this point? Yes, your honor. I guess if everything that Dr. Gribble said is correct, which we do disagree with, then that doesn't resolve the case, but it certainly bears on this issue. But I did want to point out. Let me take you back to my initial question about melting points. Because I asked you about the red brief's argument that DCA can be employed as a substitute without TCA. I wanted to direct your attention to European Pet 117, which is the primary reference. That employs DCM without TCA according to the red brief. Isn't that true? It does. Then how do you deal with that? The claim of the 559 patent expressly says in the absence of TCA or DCM. The motivation that the board found for substituting DCA for DCM in the EP 117 process was the GARDA patent. The GARDA patent teaches plainly, TCA has to be there. It is the major component of the reaction medium there. It is only modified by adding small amounts of DCA or DCM to depress its melting point. Certainly EP 117 doesn't say anything about you should avoid using TCA or TCPA. It simply is using one of the most common organic reaction solvents most commonly used with MCPBA, which was the oxidant there. There was no motivation to make this change. If I can just finish my one point on the credibility point. This was exactly the same issue in the Erikson versus Intellectual Ventures case. The court there found that the expert opinion was contrary to the evidence. The board said that they were crediting the other side's expert and concluded that Erikson's expert lacked credibility. This court dismissed that argument or that holding by the board saying this is not an issue of credibility, it's an issue of technology. The same is true here. Just because Dr. Gribble says a melting point depressant is the same thing as a solvent doesn't make it so. He's trying to revoke decades or hundreds of years of physical chemistry. I'd like to turn to a couple of other points. Can I just make a general observation and maybe I'm happy if you can respond to it. It seems to me what drove the board here was the breadth of Claim 1. Claim 1 puts in DCA. It doesn't describe or limit what DCA does. It doesn't describe or limit or concatenate how much of it is doing anything. It just seems to me that given that breadth, it's a prior art and not say there's enough here to cover this unbelievably broad and somewhat ambiguous claim. Your Honor, I guess I take exception that it was unbelievably broad. It is narrow where it distinguishes the prior art. It requires that the reaction be done in the presence of DCA and in the absence of TCA and TCPA. But it doesn't specify what DCA is doing, what purpose it serves. It doesn't specify how much is doing anything. It's the presence of something. These arguments about the- Is that a fair characterization of the breadth of the claim? It does not specify the function of DCA. The question here I would submit, Your Honor, is not claim scope. This argument comes across almost like an inherent anticipation argument. They're saying if there was motivation to substitute DCA for DCM in EP117, then EP117 would produce results that fall within the scope of the claim. That's like an inherent anticipation argument, but this is not an anticipation case. This is an obviousness case. The question is, would someone have been motivated to make that change in the first place? We argue that they wouldn't, particularly they wouldn't in view of the teaching away by the Garda reference. The Garda reference states about as plainly as can be stated that DCA is a poor medium for oxidation and that its only purpose is to depress the melting point. Well, without agreeing necessarily that this rises to the level of a teaching away, you've also got the problem that this claim, the breadth of this claim, doesn't have any limits that it's as to its efficacy, right? No, but that was the point I was making. There is no dispute that this was an advance in the art, that you can practice this claim and get the very excellent results. That's why we're fighting over it. The point here is, why would you make a substitution into another claim if there was nothing to tell you that your results are going to be better, worse, or the same, which the board as much as acknowledge in their, I think at page 11 of APPX11. But I would submit, your honor, that the, am I down to? Yeah, you're into the rebuttal. I would just like to say that the claim teaches away by saying it's a poor medium for oxidation. The board had no evidence as to how a POSA would have understood that language at the time of the invention. I also want to mention that the claim construction was legal error. There is plainly a disavowal of MCPBA here. Adama's expert admitted that the specification tells you it's unsatisfactory. If MCPBA is unsatisfactory and excluded from the scope of the invention, then the whole thing is a disavowal of MCPBA. I'll reserve some time for rebuttal. Good morning, your honors. May it please the court. The problem we have here is that, and Chemica has a very broad claim, as Judge Prost pointed out. It doesn't say what any of these are. It's a well-known product and looks for an alternative. They claimed several elements that are thrown into a pot. We'll leave it at that. There's a motivation to combine the references here. Even if we're assuming the broad substitution ability of DCA and DCM, why would somebody have done that? Why don't we look at what the motivation to combine means here, your honor? The motivation here is to make an alternative. It wasn't to make an improved product. There's no evidence here that there was any improvement in this product or in this process. There were a number of patents that are set forth in the background of the 559 patent at issue. Everyone was looking in that time for an alternative process so as to avoid other patented processes and make a standard insecticide known as Fipronil. What they were seeking was not an improved product, but simply an alternative. The motivation to combine to make the alternative is shown by the fact that they just took all of these elements and they've claimed them all, broadly, except for certain things they wanted to take out. Counsel talked about the claim language, but the claim language doesn't say what he says it says, either in his brief or in his argument. It says you start with a sulfide precursor and you oxidize it to form a sulfoxide. In the presence of DCA, as your honor noted, it doesn't say what that DCA does. He's making an argument distinguishing between solvents and melting point depressants, but the patent doesn't make that distinction. What the DCA is doing is it's a halogenated acetic acid and it's in there to create a reaction medium. You have to make a liquid vat to make this product. That's what apparently it's doing. It could be a solvent, it could be a melting point depressant, whatever that means. In Garda, they're both referred to as solvents. Then you put in an oxidizing agent, but it could be any oxidizing agent because they use an open-ended term, comprising. That oxidizing agent could be hydrogen peroxide, it could be MCPBA. All of those are oxidants, they're all peracids. One would easily interchange one for the other if you're looking for an alternative process to make Fipronil. The only other part of the claim is a disclaimer, but it doesn't say what counsel just said. It says in the absence of TCA and or TCPA. If either one of those is missing, then you disclaimer, so-called, in the last part of the claim is of no benefit at all. Their expert witness, Dr. Curran, testified that no one has ever seen TCPA. They don't even know what it is. It's a hypothetical or transient molecule. Since there isn't any TCPA that anyone can identify, the absence of TCPA would meet the limitation of that claim. Counsel said that MCPBA was clearly disavowed in the 559 patent. It was not. It's not mentioned at all. What it says is that there's general disadvantages to using the process of the EP117 patent. The patent trademark, the Patent Trial and Appeal Board made the distinction as to what that means. There's no evidence that they were wrong. The substantial evidence upon which they relied was Dr. Ribble's testimony and his declarations. He was cross-examined at great length. There was no expressed disavowal. There was nothing in the file of prosecution history. There was nothing else in the specifications. There's no mention of it in the claims. In fact, they took the opportunity in the claim to make this kind of half-hearted disclaimer of TCA and or TCPA. If they wanted to disclaim MCPBA, they could have done that. What they did is they tried to claim broadly a process for making Fipronil. They tried to claim it broadly. That got them into the trouble. If they had written the claim or if they had amended their claim in the IPR process to be more specific, to state exactly what each of these elements did, what their percentages were, the temperatures or the speed or the yield or some other process characteristics, then maybe they would have had a more specific claim which would have withstood scrutiny. But they did not. They tried to claim it broadly. They ran into that difficulty. Counsel was arguing here about why you should not pay any attention to Dr. Gripple's testimony. Frankly, that argument, I don't recall ever seeing that in his brief. The cases he was relying on are not cited in the brief. I don't think that the court should pay attention to an argument which was not made in the brief and is therefore waived. I think the bottom line is one looks at the claims of the patent. That's what they sought. That's what they got. They have to stand on those claims. We submit that those claims are obvious as found by the PTAB and that the judgment below should be affirmed. Thank you. Your Honor, Mr. Zubin started out by talking about others that were involved in the prior art. We pointed out in our brief, there were four or five other research groups who were trying to develop this process. Not a single one even mentioned DCA except for Garda. Garda had DCA in his hand. But what did he say? It's a poor medium for oxidation. Don't use it. Dr. Curran testified clearly that effect. Adama presented no evidence whatsoever on how a POSA would have understood that teaching away statement at the time of the invention. The motivation to make, it's not enough that something just be equivalent or interchangeable. This court has held that very plainly in the Belden versus Burktec case, in the personal Webtex case. There has to be some reason to motivate you to make this change. Why would you change from the most common preferred solvent used for MCPBA reactions to something completely different? Unless you had some reason to expect you were going to get a better result. This is not a matter of claim construction. This is a matter of motivation. Was there a motivation? If I can just go back to the last point Mr. Zubin made. He said that MCPBA is not even mentioned in the 559 patent. Well, his expert disagrees with him. Dr. Gribble plainly said or testified that the 559 patent describes the MCPBA reaction in EP117. He agreed that the fair reading of that language at the beginning of the 559 patent is that MCPBA is unsatisfactory. Mr. Zubin and the board characterized that as a general criticism. It wasn't a general criticism. They said it's unsatisfactory because MCPBA produces poor yields and is not reusable. That is specifically directed to MCPBA. The patent office realized, I think, that this teaching away was a problem. The patent office gave its own explanation for why they understood that statement. They didn't point to any evidence in the record. I'm jumping around a little bit, but going back to this claim construction point. The claim construction that the patent office, the reason they discounted that was they said, well, there's another oxidizing agent that's mentioned in the 559 patent, hydrogen peroxide, and it's not reusable either. The inventor's disclaimer of MCPBA was not necessary. It wasn't a valid disclaimer criticizing it because it was not reusable. This is exactly the kind of second guessing of the inventor's intent that this court has discouraged and said is not appropriate in the David Netzer versus Shell Oil case. I know I'm done. I'll just finish this sentence if I may, Your Honor. That case said that if the inventor clearly expresses an intent to disclaim, that is dispositive. Here, I don't know how the inventor could have expressed an intent to say MCPBA is not part of my invention than to say it is unsatisfactory. That's about as plain as it gets. Thank you, Your Honor.